**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **DERECK J. GARCIA-PEREZ**<br><br>Plaintiff<br><br>v.<br><br>**UNIVERSITY OF PUERTO RICO, BOARD OF TRUSTEES OF THE UNIVERSITY OF PUERTO RICO, MERCEDES S. FERRER-ALAMEDA, HECTOR J. CARLO-COLON, CRISTINA POMALES-GARCIA, THYRZIA M. ROURA-CORDERO AND CELINES ALFARO-ALMEYDA**<br><br>Defendants | **CIVIL NO.**<br>**3:25-cv-01654-MAJ** |

## AMENDED COMPLAINT

Plaintiff Dereck J. García Pérez ("Plaintiff"), by and through the undersigned counsel, hereby files this First Amended Complaint as of right pursuant to Fed. R. Civ. P. 15(a)(1)(B) against Defendants the University of Puerto Rico; the Board of Trustees of the University of Puerto Rico; Mercedes S. Ferrer Alameda; Héctor J. Carlo Colón; Cristina Pomales García; Thyrzia M. Roura Cordero; and Celines Alfaro Almeyda, and alleges as follows:

### I. INTRODUCTION AND NATURE OF THE ACTION

1. This is a civil action for disability discrimination and retaliation against a student with a documented disability by a public university and certain of its faculty and officials. Plaintiff brings claims under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 (Title II, or the ADA); the anti-retaliation provision of the ADA, 42 U.S.C. § 12203; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504); 42

1

U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment; and the law of Puerto Rico for breach of contract.

2. Plaintiff is a senior in the Industrial Engineering program at the University of Puerto Rico, Mayagüez Campus, with Level 1 Autism Spectrum Disorder. The accommodations he requires are not academic favors. They were determined by qualified professionals, adopted by the University's own disability-services office, and twice memorialized in binding written agreements that the University executed before the United States Department of Education to resolve federal civil-rights complaints. The University thereby conceded, in writing and through counsel, that these accommodations are reasonable and administrable.

3. This case is not about academic discretion. It concerns a documented refusal to obey binding federal mandates and an organized campaign of retaliation against a student for insisting that they be honored. Professor Mercedes S. Ferrer Alameda declared in writing that she would not provide Plaintiff's federally required accommodations because, in her view, they were advantages. Professor Héctor J. Carlo Colón authored a faculty resolution that reproduced Plaintiff's confidential accommodations in detail and urged the institution to refuse them, and his colleague, Senator Ferrer Alameda, who is the same professor refusing those accommodations, formally presented that resolution to the Academic Senate. The resolution's author is married to the then-Dean who supervised the department and who defended the resolution against the advice of her own institution's counsel. The University's disability-services office has known of these violations for years, facilitated two federal agreements to cure them, and failed to enforce them. The mandatory faculty training required by the 2022 federal agreement was never conducted, and the University's

2

own Rector confirmed in February 2026 that faculty were not implementing certified accommodations. In May 2026, the University promoted Professor Ferrer, the professor who refused to comply, to Interim Dean of the College of Engineering.

4. Plaintiff seeks: (a) a declaration that Defendants have violated Title II, Section 504, and his rights under the Equal Protection Clause; (b) prospective injunctive and declaratory relief requiring the University and its officials to implement and enforce his accommodations, to nullify and refrain from re-adopting the discriminatory resolution, to recuse the retaliating actors from accommodation decisions, to conduct the long-overdue training, and to submit to independent compliance monitoring; (c) compensatory damages, including for emotional distress, against the University and the Board under Title II for intentional discrimination and deliberate indifference; (d) compensatory and punitive damages against Professors Ferrer and Carlo in their individual capacities under Section 1983; (e) nominal damages; (f) damages for breach of contract; and (g) attorneys' fees and costs.

## II.    PARTIES

### *Plaintiff*

5. Plaintiff Dereck J. García Pérez is a citizen of the United States who resides in Hormigueros, Puerto Rico. He has been enrolled at the University of Puerto Rico, Mayagüez Campus (UPRM, or the University), since 2019, and is a senior-level student in the Industrial Engineering program. He has Level 1 Autism Spectrum Disorder (ASD), a mental impairment that substantially limits one or more major life activities, documented by qualified professionals and verified by the University's Office of Services for Students with Disabilities (OSEI). With his approved accommodations, Plaintiff satisfies the essential eligibility requirements and academic standards of his program. He is a qualified

individual with a disability within the meaning of Title II, 42 U.S.C. § 12131(2), and an otherwise qualified individual with a disability within the meaning of Section 504.

***Defendants***

6. Defendant University of Puerto Rico (UPR) is a public institution of higher education and an instrumentality of the Commonwealth of Puerto Rico. UPR is a public entity within the meaning of Title II, 42 U.S.C. § 12131(1). UPR receives federal financial assistance, including Title IV funds such as Pell Grants and federal student loans, federal research funding, and other federal appropriations, and is therefore subject to Section 504, 29 U.S.C. § 794. By accepting federal financial assistance, UPR has waived any Eleventh Amendment immunity as to claims under Section 504 pursuant to 42 U.S.C. § 2000d-7. UPRM is a campus of UPR.

7. Defendant Board of Trustees of the University of Puerto Rico (the Board) is the governing body of the UPR system, with final policymaking authority over all campuses, including UPRM, and is responsible for ensuring system-wide compliance with federal civil-rights law. The Board is likewise a public entity under Title II and a recipient subject to Section 504.

8. Defendant Mercedes S. Ferrer Alameda (Professor Ferrer) is, and at all relevant times was, a tenured Professor in the Department of Industrial Engineering at UPRM. She served as one of Plaintiff's professors during the Fall 2025 semester. She also serves as an Academic Senator, in which capacity she formally presented the discriminatory resolution described herein to the Academic Senate on November 18, 2025. Effective May 7, 2026, Professor Ferrer was designated Interim Dean of the College of Engineering at UPRM, a position carrying supervisory and policymaking authority over the Department of Industrial

Engineering and over the implementation of disability accommodations within the College. At all relevant times she acted under color of state law. Plaintiff sues Professor Ferrer in two capacities, each tied to the remedy the law permits. In her individual capacity, Plaintiff sues her under 42 U.S.C. § 1983 only, for compensatory and punitive damages. In her official capacity as Interim Dean of the College of Engineering, Plaintiff sues her under Title II and Section 504 only, for prospective declaratory and injunctive relief pursuant to Ex parte Young, 209 U.S. 123 (1908). Plaintiff does not seek damages against Professor Ferrer in her individual capacity under Title II or Section 504.

9. Defendant Héctor J. Carlo Colón (Professor Carlo) is, and at all relevant times was, a tenured Professor in the Department of Industrial Engineering at UPRM. He is the author and principal proponent of the faculty resolution described herein. He is married to Defendant Cristina Pomales García. At all relevant times he acted under color of state law. Plaintiff sues Professor Carlo in two capacities. In his individual capacity, Plaintiff sues him under 42 U.S.C. § 1983 only, for compensatory and punitive damages. In his official capacity as a faculty member with continuing authority over and involvement in the matters at issue, Plaintiff sues him under Title II and Section 504 only, for prospective declaratory and injunctive relief.

10. Defendant Cristina Pomales García (Dean Pomales) served, during the relevant period, as Dean of the College of Engineering at UPRM, with supervisory authority over the Department of Industrial Engineering, where Professors Ferrer and Carlo are employed and where Plaintiff is enrolled. She is married to Professor Carlo. Plaintiff sues Dean Pomales in her official capacity only, for prospective declaratory and injunctive relief pursuant to Ex parte Young. To the extent Dean Pomales no longer holds the office of Dean of the College

of Engineering, her successor in that office is automatically substituted for purposes of the official-capacity claim pursuant to Fed. R. Civ. P. 25(d).

11. Defendant Thyrzia M. Roura Cordero (Director Roura) is the interim Director of OSEI at UPRM. OSEI is responsible for determining and coordinating accommodations for students with disabilities. Plaintiff sues Director Roura in her official capacity only, for prospective declaratory and injunctive relief pursuant to Ex parte Young.

12. Defendant Celines Alfaro Almeyda (Counselor Alfaro) is an Academic Counselor at UPRM assigned to Plaintiff pursuant to the 2022 Mediation Agreement described herein. Plaintiff sues Counselor Alfaro in her official capacity only, for prospective declaratory and injunctive relief pursuant to Ex parte Young.

13. UPR and the Board are arms or instrumentalities of the Commonwealth of Puerto Rico and are state actors for purposes of the claims pleaded herein.

### III.    JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, namely Title II, 42 U.S.C. §§ 12131-12134 and § 12203; Section 504, 29 U.S.C. § 794; and 42 U.S.C. § 1983 for violation of the Fourteenth Amendment. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4).

15. This Court has supplemental jurisdiction over Plaintiff's Puerto Rico breach-of-contract claim under 28 U.S.C. § 1367(a) because that claim forms part of the same case or controversy as the federal claims, arising from the same nucleus of operative facts, namely the University's commitments to provide and enforce Plaintiff's accommodations and its failure to honor them.

16. Congress validly abrogated the States' Eleventh Amendment immunity for claims under Title II that implicate constitutional rights, including the rights at issue here. Independently, UPR and the Board have waived Eleventh Amendment immunity as to Section 504 claims by accepting federal financial assistance. 42 U.S.C. § 2000d-7.

17. Plaintiff's Title II and Section 504 claims do not require exhaustion of administrative remedies in this Circuit. The complaints Plaintiff filed with the United States Department of Education's Office for Civil Rights (OCR) are pleaded as protected activity and as evidence of Defendants' knowledge and intent, and not as a jurisdictional prerequisite.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) because UPR and UPRM are located in this District, all Defendants reside in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiff's disability and qualified status

19. Plaintiff has Level 1 Autism Spectrum Disorder. His ASD substantially limits major life activities including learning, concentrating, thinking, reading, and communicating, and substantially limits the operation of neurological and brain function.

20. Plaintiff's ASD produces substantial limitations in, among other things, executive function and working memory; sensory processing and the integration of simultaneous information; the decoding of ambiguous or implicit instructions; the management of multiple concurrent cognitive demands; and the regulation of anxiety in unstructured or unpredictable academic situations.

21. Plaintiff enrolled at UPRM in 2019 and registered with OSEI, providing the required medical and psychological documentation. OSEI reviewed that documentation and determined that Plaintiff is eligible for accommodations by reason of his ASD.

22. When his accommodations have been properly implemented, Plaintiff has successfully completed courses in his program. He satisfies the essential eligibility requirements and the legitimate academic standards of the Industrial Engineering program. His accommodations enable him to demonstrate his actual knowledge; they do not lower any academic standard and do not fundamentally alter the nature of the program.

**B.    The Approved Accommodation Plan and the Study Guide Standard**

23. Plaintiff's approved accommodation plan, documented by OSEI and incorporated into the binding federal agreements described below, includes: (a) time-and-a-half on examinations and quizzes in non-programming courses; (b) double time on programming assignments and examinations; (c) division of examinations into two parts administered on separate days, with at least one day between administrations; (d) study guides conforming to the standard described below, referred to herein as the Study Guide Standard; (e) fifteen-day advance notice of all examinations and quizzes; (f) clear and explicit written instructions, with important information highlighted; (g) no evening classes or examinations after 6:30 p.m.; (h) alternative methods of assessment in lieu of oral presentations; and (i) the availability of professors to answer questions and to review materials.

24. The Study Guide Standard requires that study guides include a specific index of the content to be evaluated, the professor's study recommendations, practice exercises on the exact topics to be tested, and an opportunity to review the guide with the professor before the examination. The purpose of the Study Guide Standard is to reduce the disproportionate

cognitive burden Plaintiff must expend to decode what to study, a task that neurotypical students perform automatically and that is extraordinarily difficult for a person with Plaintiff's disability.

**C.      The 2020 OCR agreement (the Facilitated Resolution Between Parties agreement)**

25.    In 2020, after the University failed to provide Plaintiff's accommodations, a complaint was filed with OCR on Plaintiff's behalf. On July 17, 2020, the University entered into a Facilitated Resolution Between Parties Agreement (the FRBP Agreement) in OCR Case No. 02-20-2049. The FRBP Agreement was executed on behalf of the University by its legal counsel and is binding upon the institution.

26.    The FRBP Agreement obligates the University to provide Plaintiff's approved accommodations, including specifically examinations divided into two parts with at least one day between administrations; study guides conforming to the Study Guide Standard; fifteen-day advance notice of examinations; extended time, consisting of time-and-a-half for non-programming and double time for programming; and the availability of professors to answer questions and review materials.

**D.      The 2022 OCR mediation agreement and its unmet terms**

27.    In 2022, after further violations, a second OCR complaint was filed on Plaintiff's behalf. On December 15, 2022, the parties executed a Mediation Agreement (the Mediation Agreement) in OCR Case No. 02-22-2112. The Mediation Agreement was also executed on behalf of the University by its legal counsel, and it expressly incorporates and preserves all terms of the FRBP Agreement.

28.    The Mediation Agreement added obligations, including: (a) mandatory training on reasonable accommodations for all Engineering faculty, to be completed by May 31, 2023;

(b) assignment of a qualified academic counselor, Counselor Alfaro, by January 26, 2023; (c) a response time of twenty-four to forty-eight hours for professors to address accommodation concerns; and (d) reimbursement for courses failed as a result of accommodation violations.

29. The University failed to conduct the mandatory faculty training required by the Mediation Agreement. As of the filing of this First Amended Complaint, more than three years after the May 31, 2023 deadline, the training has not been completed. When the University attempted to locate records of the training in response to a litigation-hold notice in late November 2025, it determined that no such documentation exists because the training was never provided.

**E.     Professor Ferrer's refusal to provide accommodations**

30. At the beginning of the Fall 2025 semester, OSEI sent official accommodation notifications to Plaintiff's professors, including Professor Ferrer. On August 11, 2025, OSEI conducted a mandatory faculty orientation regarding Plaintiff's accommodations, including a detailed presentation of the requirements of the Study Guide Standard. Professor Ferrer attended that orientation and was fully informed of her obligations.

31. On August 28, 2025, Plaintiff reported to OSEI that Professor Ferrer had told him directly that she would not perform his accommodations because, in her view, they would give him an advantage, and that she would not be compelled to provide them. That same day, Professor Ferrer sent an email to Plaintiff, copying OSEI and University legal counsel, in which she stated that she would provide only accommodations that, in her view, did not confer an advantage; that dividing examinations into two parts would impose additional work on her, which she declined to undertake; and that providing study guides conforming

10

to the Study Guide Standard would amount to supplying him the examination content, which she likewise declined to do.

32. Professor Ferrer's August 28, 2025 email is direct documentary evidence of intentional discrimination and of bad-faith intent. In it she characterized legally mandated accommodations as advantages, announced in writing her unilateral decision not to comply with federal law, and elevated her own convenience over Plaintiff's federally protected rights, with full knowledge that OSEI and University counsel were copied.

33. Professor Ferrer's refusal was not a judgment about the academic merits of any particular accommodation. She singled Plaintiff out and withheld his approved accommodations because of his disability and because he insisted that the University honor it. Her decision was deliberate and purposeful: she announced it in writing, with knowledge that the accommodations had been approved by OSEI and twice memorialized in binding federal agreements, and she persisted in it after repeated notice that her conduct violated those obligations.

34. On September 4, 2025, Plaintiff was required to take a quiz in Professor Ferrer's course with no accommodations, that is, with no extended time, no division, and no advance notice.

35. On September 5, 2025, OSEI held an emergency meeting with Professor Ferrer, at which, according to OSEI's notes, she verbally agreed to provide study guides, to divide examinations, and to give fifteen-day advance notice. She did not honor those commitments.

36. On September 11, 2025, Professor Ferrer sent an email proposing to modify Plaintiff's grading scheme unilaterally, so that Plaintiff would not take quizzes or submit related

11

assignments and his grade would be based only on midterms and a final examination, asserting that it was impractical to announce quizzes fifteen days in advance. This proposed modification stripped Plaintiff of graded opportunities available to other students and was not an accommodation but a denial of equal participation. Plaintiff did not agree to it.

37. On September 26, 2025, a formal meeting was held at OSEI attended by Plaintiff, his mother, Director Roura, University legal counsel, and Professor Ferrer by telephone. New written agreements were reached. On October 2, 2025, however, Professor Ferrer sent an email purporting to correct the meeting notes, unilaterally altering the terms agreed upon in the presence of the University's own counsel. Professor Ferrer's pattern, consisting of agreeing to accommodations in meetings and then repudiating those agreements in writing, evidences bad faith.

38. On October 15, 2025, Plaintiff took Examination No. 1 in Professor Ferrer's course. After receiving his graded examination, Plaintiff learned that Professor Ferrer had deducted points for requirements not stated in the examination instructions. One problem directed the student to choose between Option A and Option B; Plaintiff selected one option; and Professor Ferrer deducted points on the ground that he should have used both options in combination, although the instructions did not so state.

39. The October 15 deduction is the precise harm Plaintiff's accommodation for clear and explicit instructions is designed to prevent. Plaintiff's disability causes him to process language literally; a direction to choose between A and B denotes a choice between alternatives, not a concealed instruction to perform both. Professor Ferrer knew this was a disability-related limitation, having attended the OSEI orientation and possessing Plaintiff's

accommodation documentation. By drafting an ambiguous instruction and then penalizing Plaintiff for his literal interpretation, she discriminated against him on the basis of disability.

40. Plaintiff engaged in activity protected by the ADA and Section 504 by, among other things, filing or causing to be filed OCR complaints in 2020, 2022, and 2025; opposing Professor Ferrer's refusal to provide accommodations through OSEI; and pursuing enforcement of his federally protected rights. On September 11, 2025, a third OCR complaint was filed on Plaintiff's behalf, documenting Professor Ferrer's violations and the University's failure to enforce compliance.

**F.    The Professor Carlo resolution: coordinated institutional resistance and retaliation**

41. In the fall of 2025, Professor Carlo drafted a faculty resolution, titled Resolution on file Proper Application of Academic Accommodations in Higher Education and the Protection of Essential Academic Requirements (*Resolución sobre la aplicación adecuada de acomodos académicos en educación superior y la protección de los requisitos académicos esenciales)* (the Carlo Resolution), concerning the proper application of academic accommodations in higher education and the protection of essential academic requirements. On November 18, 2025, the Carlo Resolution was formally presented to the Academic Senate of UPRM by Senator Ferrer Alameda, who was the same professor then refusing to provide Plaintiff's accommodations.

42. The Carlo Resolution attacks accommodations identical to Plaintiff's. Among other things, it argues against dividing examinations into two parts with intervening days on the stated theory that the student cannot memorize; against providing simplified study materials that indicate exactly what will be included on the examination and in what order; against

13

prominently marking important information within problems; and against providing detailed and specific instructions that can be followed rigorously.

43. The specificity of these descriptions is extraordinary and not generic. The Carlo Resolution tracks Plaintiff's exact accommodations, down to particulars such as exam division on the stated theory that the student cannot memorize. Within the small community of the Department of Industrial Engineering, and in the context of an ongoing and known accommodation dispute, the Carlo Resolution effectively disclosed Plaintiff's confidential accommodation information to a faculty governance body without his consent. That disclosure is pleaded not as a stand-alone statutory violation but as evidence of discriminatory animus and retaliatory intent.

44. The Carlo Resolution was not private commentary. It was drafted by a tenured member of the faculty, formally presented by an Academic Senator to the Academic Senate of UPRM, which is an official governance organ of the institution, and submitted for the Senate's consideration. Through that process the University's own faculty-governance machinery was used to target Plaintiff's specific, confidential accommodations and to urge the institution to refuse accommodations identical to his. The Resolution reflects a purpose to deny Plaintiff, on the basis of his disability, the accommodations to which he is legally entitled.

45. The timing of the Carlo Resolution evidences retaliation. It was drafted after Plaintiff's September 2025 OCR complaint and presented to the Academic Senate on November 18, 2025, in close temporal proximity to Plaintiff's protected activity, and it targeted Plaintiff's exact accommodations.

46. The Carlo Resolution contains statements that are legally erroneous and that evidence animus, including that accommodations like Plaintiff's are not compatible with the education a university student seeks and do not align with the graduate profile; that OSEI has been applying primary and secondary standards under the Individuals with Disabilities Education Act (IDEA) rather than postsecondary standards, a mischaracterization that ignores the protections of Section 504 and the ADA applicable to higher education; and that there is no precedent for universities losing federal funding over accommodation disputes.

47. The Carlo Resolution proposes to vest faculty committees with authority to deny accommodations. That proposal contravenes federal law, which places on the institution the burden of demonstrating, through professional, deliberate, and expert academic judgment in an individualized determination, that a requested accommodation would fundamentally alter the program. A general faculty resolution cannot substitute for that individualized, documented analysis.

48. After the University received a litigation-hold notice on November 26, 2025, it searched for documentation of the mandatory faculty training and discovered that the training had never been completed. In the days that followed, University legal counsel recommended withdrawing the Carlo Resolution, prompting a heated dispute between counsel and Dean Pomales, who, as Professor Carlo's spouse, had a personal interest in defending it. The University's purported withdrawal of the Carlo Resolution only after notice of litigation evidences consciousness of guilt and discriminatory animus.

49. The Carlo Resolution was not abandoned. Upon information and belief, after its purported withdrawal the same resolution remained under active consideration within the College of

Engineering, including before an Ad Hoc Committee of the Engineering faculty, and was advanced toward further consideration by the Academic Senate during the first half of 2026. The challenged policy effort thus persisted after the filing of the original Complaint, and Defendants cannot show that the conduct cannot reasonably be expected to recur.

50. Professor Carlo's discriminatory intent is further evidenced by his public writings. On November 30, 2023, he published a blog post on his personal website (hjcarlo.wordpress.com), titled in Spanish *La razonabilidad de los acomodos razonables en las universidades*, addressing the reasonableness of reasonable accommodations in universities, in which he questioned the reasonableness of accommodations similar to Plaintiff's, presented data concerning students with accommodations in his courses, and argued that certain accommodations should not be provided.

51. The 2023 blog post and the Carlo Resolution together evidence a pattern of ideological opposition to disability accommodations that predates and motivates the specific conduct directed at Plaintiff. This is not a good-faith disagreement about how to implement accommodations; it is a coordinated effort by faculty members who object to the legal requirement to provide accommodations at all.

**G.    Dean Pomales's conflict of interest**

52. Dean Pomales, during the relevant period, had supervisory authority over the Department of Industrial Engineering, where Professors Ferrer and Carlo are employed and where Plaintiff is enrolled. She is married to Professor Carlo, the author of the Carlo Resolution. This created an irreconcilable conflict of interest.

53. Despite that conflict, Dean Pomales did not recuse herself from matters involving Plaintiff's accommodations or the Carlo Resolution. Instead, she defended her spouse's

16

resolution against the advice of University counsel, allowing a personal relationship to compromise her duty to ensure compliance with federal disability law within her College.

54. As Dean of the College of Engineering during the relevant period, Dean Pomales held supervisory and policymaking authority over the Department in which Plaintiff is enrolled. Rather than enforce Plaintiff's accommodations or remove herself from a matter in which her spouse was the principal proponent, she made the deliberate choice to defend the Carlo Resolution, including against the advice of the University's own counsel. Her conduct reflects an intentional decision, at the policymaking level of the College, to support the effort to deny accommodations identical to Plaintiff's.

## H.    OSEI's Deliberate Indifference

55. Director Roura and OSEI have been aware of the violations against Plaintiff since 2020. They facilitated two OCR agreements, attended meetings at which Professor Ferrer agreed to provide accommodations, and received Plaintiff's complaints when those agreements were broken. OSEI nevertheless failed to take effective action to enforce compliance.

56. OSEI's response to Professor Ferrer's documented violations was limited to acknowledgment emails and ineffective meetings. OSEI did not refer Professor Ferrer for disciplinary action, did not effectively escalate the matter, and did not deploy institutional authority to protect Plaintiff. Counselor Celines Alfaro, the academic counselor assigned to Plaintiff, acknowledged to him that the University's institutional structures left her without authority to compel Professor Ferrer's compliance. The University's failure to vest the offices responsible for Plaintiff's accommodations with any effective power to enforce them against resistant faculty, while the University remained bound in writing to provide

17

those accommodations, was a conscious institutional choice that reflects deliberate indifference at the institutional level.

57. The University's failure to enforce Plaintiff's accommodations was not the product of oversight or inadvertence. The University had specific, repeated, and documented notice of the violations from 2020 forward, had twice committed in writing before the United States Department of Education to cure them, and, through its administration and the Board, had the authority to compel compliance. Its sustained refusal to exercise that authority, while its faculty openly and in writing refused to comply and advanced an institutional resolution against Plaintiff's accommodations, was a conscious institutional choice to tolerate and align itself with that refusal rather than honor its binding obligations. The University made that choice because of Plaintiff's disability and his assertion of his disability rights, and not merely in spite of its effects upon him. The University's conduct was therefore both deliberately indifferent and intentionally discriminatory.

## I. Counselor Alfaro's failure to provide services

58. The Mediation Agreement required the University to assign Plaintiff a qualified academic counselor by January 26, 2023. Counselor Alfaro was assigned. Since then, she has failed to provide the academic-counseling services the Mediation Agreement required: she does not respond to meeting requests within reasonable timeframes; she provides evasive responses and refers Plaintiff elsewhere without resolving his concerns; she has failed to attend scheduled meetings regarding accommodation implementation; and she has failed to provide guidance on academic planning and course selection.

59. As a result of Counselor Alfaro's failures, Plaintiff has experienced delays in academic progress and inefficient consumption of his Pell Grant eligibility.

**J.    Harm to Plaintiff**

60.    The University's conduct after the original Complaint confirms that the violations are continuing and that the institution has ratified, rather than corrected, the discrimination.

61.    On February 11, 2026, the Rector of UPRM issued a written communication to the Dean of Students acknowledging that faculty were not effectively implementing certified reasonable accommodations, and directing the design and implementation of a standardized faculty intervention protocol, including mandatory faculty training. This communication is an institutional admission of ongoing noncompliance; it confirms that, as of February 2026, the mandatory training required since May 31, 2023 still had not been conducted; and it shows that the University's response remained, at that late date, the prospective design of a protocol rather than actual compliance with its binding federal obligations.

62.    On May 7, 2026, the Interim Rector of UPRM announced the designation of Professor Ferrer, the professor who refused to provide Plaintiff's accommodations and characterized them as advantages, as Interim Dean of the College of Engineering, effective that date, conferring upon her supervisory and policymaking authority over the Department of Industrial Engineering and over the implementation of disability accommodations within the College. The University's elevation of Professor Ferrer to that office, while this litigation was pending, constitutes ratification of her conduct, evidences the University's deliberate indifference, and creates a continuing and prospective risk that Plaintiff's accommodations will not be honored.

63.    By conferring policymaking authority over the College of Engineering, including over the implementation of disability accommodations, upon the very professor who had refused

Plaintiff's accommodations and characterized them as advantages, the University ratified and adopted her intentional discrimination as its own, with full knowledge of her documented conduct and of this litigation.

64. Defendants' conduct has caused Plaintiff substantial and ongoing harm.

65. Academically and economically, Plaintiff has been required to take assessments without his accommodations, resulting in lower grades than he would have earned, and has been required to repeat coursework. His anticipated graduation has been delayed and rendered uncertain. He has paid tuition for courses he should not have had to repeat, and his Pell Grant eligibility has been depleted by repeated courses, exposing him to additional cost and delayed entry into the workforce.

66. Emotionally, Plaintiff suffers severe anxiety and distress. He has been humiliated and degraded by the characterization of his accommodations as advantages and by the public targeting of his confidential accommodations before the Academic Senate. His disability-related anxiety has worsened, he has required increased mental-health treatment, and he has lost confidence in his academic abilities.

67. Plaintiff has been made the target of organized institutional hostility, has been denied equal educational opportunity, and has been forced to litigate for accommodations that should have been provided automatically under two binding federal agreements.

**K.   Intentional Discrimination and Institutional Responsibility**

68. The discrimination and retaliation alleged herein were intentional and purposeful. Professors Ferrer and Carlo, and Dean Pomales, acted because of Plaintiff's disability and his assertion of his federally protected rights, and not merely with awareness of the effects of their conduct upon him.

69. Professors Ferrer and Carlo, and Dean Pomales, acted at all relevant times within the scope of their authority as officials and agents of the University, in the performance of their faculty, senatorial, and administrative functions. Their intentional, disability-based differential treatment of Plaintiff is attributable to UPR and the Board.

70. The University did not merely fail to prevent the conduct of its agents. Its own governance and policymaking organs participated in and adopted that conduct: the Academic Senate received and entertained the Carlo Resolution; the Dean of the College defended it and declined to recuse; the institution elevated the refusing professor to Interim Dean of the College of Engineering; and the institution declined, with full and specific knowledge, to enforce accommodations it had twice agreed in writing to provide. Through these acts the University itself acted with discriminatory purpose toward Plaintiff on the basis of his disability.

71. The conduct of UPR and the Board, through their agents acting within the scope of their authority and through the deliberate decisions of their own policymakers and governance organs, was both deliberately indifferent and intentionally discriminatory, and independently violated the Equal Protection Clause of the Fourteenth Amendment.

### V.    CAUSE OF ACTION

**COUNT I**
**Violation of Title II of the ADA**
**Against UPR and the Board, and against Professors Ferrer and Carlo, Dean Pomales, Director Roura, and Counselor Alfaro in their official capacities for prospective relief only**

72. Plaintiff incorporates by reference paragraphs 1 through 71 as if fully set forth herein.

73. Title II provides that no qualified individual with a disability shall, by reason of disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by a public entity. 42 U.S.C. §

12132. A public entity must make reasonable modifications to its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability, unless it demonstrates that the modification would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7). A public entity may not use methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination. 28 C.F.R. § 35.130(b)(3).

74. Plaintiff is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2). His Level 1 Autism Spectrum Disorder substantially limits the major life activities of learning, concentrating, thinking, reading, and communicating, is documented by qualified professionals and verified by OSEI, and, with his approved accommodations, he satisfies the essential eligibility requirements and legitimate academic standards of the Industrial Engineering program. UPR, the Board, and UPRM are public entities within the meaning of 42 U.S.C. § 12131(1). The official-capacity Defendants hold, within their respective offices, authority over the University's programs and over the determination and implementation of Plaintiff's accommodations, and are proper Defendants for prospective declaratory and injunctive relief to remedy the ongoing violation of federal law.

75. Defendants denied Plaintiff the benefits of, and subjected him to discrimination in, the University's programs by reason of his disability, and refused the reasonable modifications necessary to avoid that discrimination. The modifications withheld are the very accommodations OSEI determined Plaintiff required by reason of his ASD, that OSEI adopted, and that the University twice memorialized in the 2020 and 2022 federal agreements.

22

76. The denial was by reason of disability, and not the product of any neutral or non-disability ground, because the conduct withheld precisely those disability-based accommodations and was justified on no other basis: Professor Ferrer refused them in writing on August 28, 2025 on the stated ground that they conferred an advantage; Plaintiff was required to sit a quiz with none of his accommodations on September 4, 2025; Professor Ferrer proposed on September 11, 2025 to eliminate graded components available to other students; and on October 15, 2025 she deducted points for a requirement not stated in the examination instructions, penalizing the literal processing that his clear-instructions accommodation exists to address.

77. Defendants made no individualized, professional, and documented determination that any of these accommodations would fundamentally alter the Industrial Engineering program, and cannot make one, because Plaintiff has completed coursework in that program when the accommodations were properly implemented, which establishes their administrability, and because the University conceded their reasonableness by adopting them and agreeing in writing to provide them.

78. UPR and the Board acted with intentional discrimination and with deliberate indifference to Plaintiff's federally protected rights, and that culpable state of mind is established by the facts alleged. They had specific, repeated, and documented notice of the violations from 2020 forward, twice committed in writing before the United States Department of Education to cure them, and possessed the authority to compel compliance. Notwithstanding that notice and authority, they permitted the violations to continue, limited their response to acknowledgment emails and ineffective meetings, did not refer Professor Ferrer for discipline, failed to conduct the mandatory faculty training more than three years

after its deadline, admitted through the Rector in February 2026 that faculty were not implementing certified accommodations, and in May 2026 elevated the refusing professor to Interim Dean of the College of Engineering. It follows that the institution made a conscious choice to tolerate and align itself with the refusal rather than honor its binding obligations.

79. The conduct alleged independently violated the Equal Protection Clause of the Fourteenth Amendment, because it was purposeful and undertaken because of Plaintiff's disability and not merely with awareness of its effects upon him. Defendants refused federally mandated accommodations on the stated ground that they conferred an advantage, used the University's own faculty-governance machinery to target Plaintiff's confidential accommodations through the Carlo Resolution, and ratified that refusal by conferring policymaking authority over the College upon the refusing professor. Congress validly abrogated the States' Eleventh Amendment immunity for Title II damages claims to the extent the challenged conduct independently violates the Fourteenth Amendment. Because the conduct of UPR and the Board independently violated the Equal Protection Clause, the Eleventh Amendment does not bar Plaintiff's Title II damages claim against UPR and the Board.

80. As a direct and proximate result of the foregoing, Plaintiff has suffered the injuries described above. Plaintiff remains enrolled, continues to require his accommodations, and faces a continuing and imminent risk that they will not be honored, particularly now that Professor Ferrer exercises supervisory and policymaking authority as Interim Dean of the College of Engineering. As against UPR and the Board, Plaintiff is entitled to compensatory damages, including damages for emotional distress, under Title II, which is

not Spending Clause legislation, for intentional discrimination and deliberate indifference. As against UPR, the Board, and the official-capacity Defendants, Plaintiff is entitled to declaratory and prospective injunctive relief and to reasonable attorneys' fees and costs under 42 U.S.C. § 12205. Plaintiff does not seek punitive damages under Title II.

**COUNT II**
**Violation of Section 504 of the Rehabilitation Act**
**Against UPR and the Board, and against the individual Defendants in their official capacities for prospective relief only**

81. Plaintiff incorporates by reference paragraphs 1 through 80 as if fully set forth herein.

82. Section 504 provides that no otherwise qualified individual with a disability shall, solely by reason of disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a). The standards governing whether a violation has occurred are, in relevant part, those of Title II. 29 U.S.C. § 794(d).

83. Plaintiff is an otherwise qualified individual with a disability. UPR and the Board are recipients of federal financial assistance, including Title IV funds such as Pell Grants and federal student loans, and their programs are therefore subject to Section 504. Defendants subjected Plaintiff to discrimination solely by reason of his disability by denying him the academic adjustments necessary to ensure equal access to the University's programs. The denial was solely by reason of disability because the adjustments withheld were his approved disability-based accommodations, refused on the stated ground that they conferred an advantage and on no legitimate academic basis. The denial extended beyond the classroom to the University's failure to perform the additional obligations it undertook to secure those accommodations, namely the mandatory faculty training, the assignment

25

and effective service of a qualified academic counselor, the defined response times, and reimbursement for courses failed as a result of accommodation violations.

84. By accepting federal financial assistance, UPR and the Board have waived any Eleventh Amendment immunity as to claims under Section 504. 42 U.S.C. § 2000d-7.

85. As a direct and proximate result of the foregoing, Plaintiff has suffered injury. As against UPR and the Board, Plaintiff seeks declaratory and prospective injunctive relief and pecuniary compensatory damages, including out-of-pocket losses and amounts reimbursable under the agreements. Because Section 504 is Spending Clause legislation, Plaintiff does not seek emotional-distress damages under Section 504 and instead channels his emotional-distress damages through his Title II claims. Plaintiff seeks reasonable attorneys' fees and costs under 29 U.S.C. § 794a(b). Plaintiff does not seek punitive damages under Section 504.

## COUNT III
### Retaliation Under the ADA, 42 U.S.C. § 12203, and Section 504
### Against UPR and the Board, and against Professors Ferrer and Carlo in their official capacities for prospective relief only

86. Plaintiff incorporates by reference paragraphs 1 through 85 as if fully set forth herein.

87. The ADA prohibits retaliation against any individual because that individual has opposed an act or practice made unlawful by the ADA, or has made a charge or participated in a proceeding under the ADA. 42 U.S.C. § 12203(a); 28 C.F.R. § 35.134. Section 504 incorporates equivalent anti-retaliation protections. 34 C.F.R. § 104.61 (incorporating 34 C.F.R. § 100.7(e)). A claim of retaliation requires protected activity, knowledge of that activity by the actor, a materially adverse action, and a causal connection between the protected activity and the adverse action.

26

88. Plaintiff engaged in protected activity, and Defendants knew of it. Plaintiff filed or caused to be filed OCR complaints in 2020, 2022, and on September 11, 2025, and opposed, through OSEI and in direct communications, the refusal to provide his accommodations. Defendants had knowledge of that protected activity because it was directed at and communicated to them: Professor Ferrer's own August 28, 2025 email was copied to OSEI and University legal counsel, and the September 26, 2025 meeting concerning the complaints was attended by University counsel.

89. Defendants subjected Plaintiff to materially adverse action because of that protected activity, and that action consisted of affirmative conduct, not mere inaction. After Plaintiff's complaints, Professor Ferrer escalated her treatment of him by requiring him to sit a quiz with none of his accommodations on September 4, 2025, by proposing on September 11, 2025 to eliminate graded components available to other students, and by deducting points on October 15, 2025 for a requirement not stated in the instructions. After Plaintiff's September 2025 OCR complaint, Professor Carlo drafted, and Senator Ferrer formally presented to the Academic Senate on November 18, 2025, a resolution that reproduced Plaintiff's exact and confidential accommodations and urged their refusal, a completed act that exposed those confidential accommodations to a faculty governance body and was reasonably likely to deter a reasonable person from engaging in protected activity. Professors Ferrer and Carlo took these actions within the scope of their authority as faculty, and in Professor Ferrer's case as an Academic Senator, and UPR and the Board are responsible under Title II and Section 504 for those acts, ratified them, and were deliberately indifferent to them, including by failing to take corrective action and by elevating Professor Ferrer to Interim Dean while this dispute was pending.

90. A causal connection exists between the protected activity and the adverse action. The Carlo Resolution was drafted after and in close temporal proximity to Plaintiff's September 2025 OCR complaint and was presented to the Academic Senate on November 18, 2025, and it targeted Plaintiff's exact accommodations. That combination of close timing and precise targeting of Plaintiff's own accommodations supports the inference that the conduct was because of his protected activity.

91. The materially adverse action is the escalating conduct, the drafting and public presentation of the resolution, and the institution's ratification of that conduct, and does not depend on whether the resolution was ultimately applied. Plaintiff's retaliation claim is therefore neither unripe nor moot. The University's purported withdrawal of the resolution, undertaken only after notice of litigation, does not moot the claim, and the University's subsequent elevation of the refusing professor to Interim Dean confirms a continuing and prospective risk of recurrence that the University cannot disprove.

92. As a direct and proximate result of the foregoing, Plaintiff has suffered injury. Plaintiff seeks declaratory and prospective injunctive relief against UPR, the Board, and Professors Ferrer and Carlo in their official capacities; compensatory relief against UPR and the Board to the extent permitted, including under Section 504 and, under Title II, to the extent the retaliatory conduct independently violated the Fourteenth Amendment; and reasonable attorneys' fees and costs.

**COUNT IV**
**Deprivation of Equal Protection, 42 U.S.C. § 1983**
**Against Professors Ferrer and Carlo in their individual capacities only**

93. Plaintiff incorporates by reference paragraphs 1 through 92 as if fully set forth herein.

94. Section 1983 provides a remedy for the deprivation, under color of state law, of rights secured by the Constitution. The Equal Protection Clause of the Fourteenth Amendment

forbids a state actor from intentionally treating an individual differently from others similarly situated where there is no rational basis for the difference, and is violated, among other ways, where the differential treatment is motivated by a malicious or bad-faith intent to injure.

95. Plaintiff's claim vindicates a right secured directly by the Equal Protection Clause, independent of and not coextensive with any right created by Title II or Section 504. Plaintiff does not seek to enforce those statutes through Section 1983; he seeks redress for an independent constitutional injury, namely intentional differential treatment motivated by animus. The remedial schemes of Title II and Section 504 therefore do not foreclose this action.

96. Professors Ferrer and Carlo at all relevant times acted under color of state law as officials of a public university.

97. Professor Ferrer intentionally treated Plaintiff differently from others similarly situated. Plaintiff attended Professor Ferrer's Fall 2025 Industrial Engineering courses together with classmates who did not require disability accommodations and who were subject to the same examination instructions, grading, and graded components. Plaintiff alone was subjected to ambiguous instructions applied against him on October 15, 2025, to grading criteria not stated on the examination, and to the unilateral elimination on September 11, 2025 of graded components by which credit could be earned, while his classmates received instructions as written, grading according to the stated instructions, and the full complement of graded components. Viewed objectively, Plaintiff and those classmates are roughly equivalent in all relevant respects. Because Plaintiff has completed coursework in his program when his accommodations were properly implemented, his differential

treatment cannot be explained by any deficiency on his part, and Professor Ferrer's refusal was a singling-out of Plaintiff rather than a neutral academic judgment.

98. Professor Carlo intentionally treated Plaintiff differently from others similarly situated. He authored, and caused to be presented to the Academic Senate, a resolution that reproduced Plaintiff's exact and confidential accommodations with a specificity that was extraordinary and not generic, down to particulars unique to his plan, and that urged the institution to refuse accommodations identical to his, while the accommodations of other students were not so targeted. The specificity of that resolution supports the inference of access to Plaintiff's confidential accommodation records and of an intent to single Plaintiff out individually. Professor Carlo's animus predated and motivated that conduct, as evidenced by his November 30, 2023 blog post questioning the reasonableness of accommodations similar to Plaintiff's, and his conduct followed closely upon Plaintiff's September 2025 OCR complaint.

99. The differential treatment was motivated by a malicious or bad-faith intent to injure and by intent to punish Plaintiff for exercising his federally protected rights. That intent is shown by Professor Ferrer's written characterization of legally mandated accommodations as advantages and her written refusal to comply, by her pattern of agreeing to accommodations in meetings and then repudiating them in writing, by Professor Carlo's targeting of Plaintiff's exact and confidential accommodations, by the close temporal proximity between Plaintiff's OCR complaints and Defendants' conduct, and by the conflict of interest among the actors. There was no rational basis for the differential treatment, because the accommodations had already been determined, adopted, and twice memorialized, and Plaintiff's own completion of coursework establishes that they are

30

administrable and lower no academic standard, so the refusal rested on animus rather than on any legitimate academic ground. The conduct was not the discretionary, individualized academic evaluation that might otherwise counsel against equal-protection review of a claim brought by a single individual, and any limitation on such claims applicable to discretionary governmental decisions arose in the distinct context of public employment and does not foreclose Plaintiff's claim.

100. The conduct of Professors Ferrer and Carlo was willful, intentional, and undertaken with reckless or callous indifference to Plaintiff's federally protected rights. As a direct and proximate result, Plaintiff has suffered the injuries described above and is entitled, as against Professors Ferrer and Carlo in their individual capacities, to compensatory damages, nominal damages, punitive damages, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT V**
**Breach of Contract**
**Against UPR and the Board**

101. Plaintiff incorporates by reference paragraphs 1 through 100 as if fully set forth herein.

102. The 2022 Mediation Agreement is a valid and binding agreement executed by Plaintiff, by his mother, and by the University acting through its legal counsel. Plaintiff is a signatory party to that Agreement and is entitled to enforce it. The 2022 Mediation Agreement expressly incorporates and preserves all terms of the 2020 Facilitated Resolution Between Parties Agreement, and Plaintiff is therefore entitled, as a party to the 2022 Agreement, to enforce the incorporated 2020 terms as well. The 2020 Agreement was executed by Plaintiff's mother, on his behalf and for his direct benefit, and by the University, and Plaintiff is the intended beneficiary of that Agreement. Together the agreements obligate the University to provide and enforce Plaintiff's accommodations and to perform the

additional obligations set forth above, including the mandatory faculty training, the assignment of a qualified academic counselor, the defined response times, and reimbursement for courses failed as a result of accommodation violations.

103. The provision of the 2020 Agreement recognizing that a party may file a further complaint with OCR upon a breach is permissive and non-exclusive. It preserves an additional administrative avenue rather than restricting the parties to one, does not designate an OCR complaint as the sole or exclusive remedy for a breach, does not waive the parties' right to enforce the agreements' terms, and by its own terms governs only how OCR will treat a breach-based complaint if one is filed. Nothing in either agreement forecloses judicial enforcement of the binding obligations the University undertook.

104. Plaintiff performed his obligations under the agreements, including by maintaining enrollment, submitting the required medical and psychological documentation, and requesting his accommodations through proper channels.

105. UPR and the Board breached the agreements. They failed to provide Plaintiff's accommodations; failed to conduct the mandatory faculty training required by the 2022 Agreement; failed to provide the adequate academic-counseling services the 2022 Agreement required; and failed to reimburse Plaintiff for courses failed as a result of accommodation violations.

106. As a direct and proximate result of those breaches, Plaintiff has been damaged, including by tuition paid for repeated courses, depleted Pell Grant eligibility, and other economic losses, in an amount to be determined at trial. Plaintiff is entitled to damages and to such equitable relief, including specific performance, as the Court deems appropriate under the law of Puerto Rico.

## COUNT VI
### Disability-Based Hostile Educational Environment, Title II and Section 504
### Against UPR and the Board, and against Professors Ferrer and Carlo in their official capacities for prospective relief only

107. Plaintiff incorporates by reference paragraphs 1 through 106 as if fully set forth herein.

108. Title II and Section 504 prohibit not only the denial of reasonable accommodations but also disability-based harassment that creates a hostile educational environment. 42 U.S.C. § 12132; 29 U.S.C. § 794(a). To state such a claim, a plaintiff must be a qualified individual with a disability who was subjected to unwelcome harassment based on his disability that was sufficiently severe, pervasive, and objectively offensive that it altered the conditions of his education and created an abusive educational environment and effectively deprived him of access to educational benefits and opportunities, and the institution must have had actual knowledge of the harassment and been deliberately indifferent to it.

109. Plaintiff is a qualified individual with a disability. UPR, the Board, and UPRM are a public entity within the meaning of Title II and a recipient of federal financial assistance within the meaning of Section 504. The official-capacity Defendants hold authority over the University's programs and over the conditions of Plaintiff's education and are proper Defendants for prospective relief.

110. Plaintiff was subjected to unwelcome harassment because of his disability, and each instance was directed at his disability or at his disability-based accommodations. Professor Ferrer, over the course of the semester, repeatedly refused his approved accommodations and characterized them, in writing and to others, as advantages, thereby degrading him on the basis of his disability. Professor Carlo authored, and Senator Ferrer presented to the Academic Senate on November 18, 2025, a resolution that reproduced Plaintiff's exact and confidential    accommodations    and    urged    their    refusal,    publicly    targeting    his

33

disability-related accommodations before a faculty governance body. Professor Ferrer agreed to accommodations in meetings and then repudiated those agreements in writing, and on October 15, 2025 deducted points in a manner that penalized the disability-related limitation his accommodations were designed to address.

111. This harassment was severe, pervasive, and objectively offensive, because it was sustained across the Fall 2025 semester and beyond, was directed specifically at Plaintiff's disability and at his confidential accommodations, and included the public exposure and targeting of those accommodations before an official governance organ of the University. As a consequence, Plaintiff has been humiliated and degraded, has come to fear attending class, has suffered a worsening of his disability-related anxiety, has required increased mental-health treatment, and has been required to undertake assessments without his accommodations, resulting in lower grades and repeated coursework. The harassment thereby altered the conditions of Plaintiff's education, created an abusive educational environment, and effectively deprived him of equal access to the University's programs.

112. UPR and the Board had actual knowledge of the disability-based harassment and were deliberately indifferent to it. OSEI and the University's administration were aware of the conduct from 2020 forward, facilitated two OCR agreements, received three OCR complaints, and had repeated and specific notice, yet they failed to enforce Plaintiff's accommodations, failed to refer the refusing professor for discipline, and elevated her to Interim Dean of the College of Engineering while this dispute was pending.

113. As a direct and proximate result of the foregoing, Plaintiff has suffered the injuries described above. As against UPR and the Board, Plaintiff is entitled to compensatory damages, including damages for emotional distress, under Title II, which is not Spending

Clause legislation, for the hostile educational environment, to the extent not duplicative of the relief sought in Count I, and on the same basis on which the Eleventh Amendment does not bar Plaintiff's Title II damages claim. As against UPR, the Board, and the official-capacity Defendants, Plaintiff is entitled to declaratory and prospective injunctive relief and to reasonable attorneys' fees and costs under 42 U.S.C. § 12205. Plaintiff does not seek punitive damages under Title II or Section 504.

## VI.    JURY TRIAL DEMANDED

114. Plaintiff demands a trial by jury on all claims and issues so triable, including his claim for compensatory and punitive damages under 42 U.S.C. § 1983 (Count IV) and his claim for compensatory damages under Title II (Counts I and VI). Plaintiff does not demand a jury as to claims seeking only equitable or declaratory relief.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. A declaration, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, that Defendants have violated Title II, Section 504, and Plaintiff's rights under the Equal Protection Clause; that the FRBP Agreement and the Mediation Agreement are valid and enforceable and that Plaintiff is entitled to the accommodations specified therein; and that the Carlo Resolution is unlawful;

B. Permanent injunctive relief:

    a. Requiring UPR and the Board, and the official-capacity Defendants, to implement and enforce all of Plaintiff's accommodations under the agreements without delay;

    b.  Requiring Defendants to nullify the Carlo Resolution and to refrain from adopting or re-adopting any substantially similar resolution or policy;

    c.  Requiring Defendants to refrain from retaliation against Plaintiff;

    d.  Requiring Defendants to recuse Professors Ferrer and Carlo, and any other actor who has refused or opposed Plaintiff's accommodations, from any decision concerning Plaintiff's accommodations;

    e.  Requiring Defendants to conduct the mandatory faculty training required by the Mediation Agreement;

    f.  Requiring Defendants to correct Plaintiff's academic record and to afford him the opportunity to retake, with accommodations, any assessment administered without them; and

    g.  Requiring Defendants to submit to independent monitoring of compliance for a period to be determined by the Court;

C.  Compensatory damages, including for emotional distress, against UPR and the Board under Title II, in an amount to be determined at trial;

D.  Pecuniary compensatory damages against UPR and the Board under Section 504, in an amount to be determined at trial;

E.  Compensatory damages against Professors Ferrer and Carlo in their individual capacities under Section 1983, in an amount to be determined at trial;

F.  Punitive damages against Professors Ferrer and Carlo in their individual capacities under Section 1983, in an amount to be determined at trial;

G.  Damages and equitable relief for breach of contract against UPR and the Board, in an amount to be determined at trial;

H.  Reasonable attorneys' fees and costs under 42 U.S.C. § 12205 as to the ADA claims, 29

U.S.C. § 794a(b) as to the Section 504 claim, and 42 U.S.C. § 1988 as to the Section 1983

claim; and

I.   Such other and further relief as this Court deems just and proper.

Dated: July 3, 2026

**VELEZ LAW GROUP LLC**
Civil Rights Division


s/José Carlos Vélez Colón
José Carlos Vélez Colón
USDC-PR 231014

1449 S Michigan Ave STE 13234
Chicago, IL 60605

Email:  vlg@velezlawgroup.com
Tel.:   (787)-422-1881

**PLAINTIFF'S ATTORNEY**

37